DMITRY Y. GUROVICH, SBN 181427
ELON BERK, SBN 209642
GUROVICH, BERK & ASSOCIATES, APC
15250 Ventura Blvd., Suite 1220
Sherman Oaks, CA 91403
Telephone: (818) 205-1555
Facsimile: (818) 205-1559
Email: gba_law@yahoo.com

Attorneys for Petitioners

## UNITED STATES DISTICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: | CASE NO. |
| GUSTAVO ESCAMILLA and GREENWAY NUTRIENTS, INC. | VICTIMS' EMERGENCY PETITION FOR ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT, 18 U.S.C. SECTION 3771 |
| Petitioners | |

COMES NOW PETITIONER, GUSTAVO ESCAMILLA (hereinafter "ESCAMILLA") and

PETITIONER GREENWAY NUTRIENTS, Inc. (hereinafter "GREENWAY") (hereinafter collectively

"PETITIONERS"), by and through his undersigned attorneys, pursuant to the Crime Victim's Rights

Act, 18 U.S.C. Section 3771 ("'CVRA."), and file this Emergency Petition for Enforcement in the above

entitled action as follows:

**PARTIES, JURISDICTION, VENUE**

PETITIONER Escamilla, an adult who resides within the jurisdiction of the Central District of

California, and PETITIONER Greenway Nutrients, Inc., a corporate entity located in and doing business

in the jurisdiction of the Central District of California, were proximately harmed by, and were victims of

Federal crimes committed by DAVID DRAGAN SELAKOVIC ("hereinafter SELAKOVIC"), Steven

BLACKBURN ("hereinafter BLACKBURN"), and corporate entities operated or ultimately controlled

by the Defendants  (hereinafter "ENTITIES"), (all three hereinafter collectively "DEFENDANTS").

VICTIMS' EMERGENCY PETITION FOR
ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT,
18 U.S.C. SECTION 3771

1

The alleged crimes committed by DEFENDANTS, against the PETITIONERS include, but are not limited to, embezzlement, 18 U.S.C. §645, securities and commodities fraud, 18 U.S.C. §1348, mail and wire fraud;18 U.S.C. §1343.

18 U.S.C. §3771(d)(3) provides that;

"The rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime, or if no prosecution is underway, in the district court in the district in which the crime occurred. The district court shall take up and decide any motion asserting a victim's right forthwith."

DEFENDANTS committed these crimes with the jurisdiction of the Central District of California.

### PETITIONERS' PRELIMINARY STATEMENT

The PETITIONER'S Emergency CRVA Petition is the quintessential example of a wealthy and politically connected Defendant Selakovic that the DHS officials represented was charged with criminal wrongdoing, who has mysteriously avoided any criminal liability regarding the alleged unlawful acts described in the body of the PETITIONER"S CVRA petition.

Notwithstanding multiple federal law enforcement agencies ongoing knowledge of the alleged criminal wrongdoing that SELAKOVIC and BLACKBURN have been repeatedly accused of engaging in since February of 2000.

Moreover, SELAKOVIC is purported to be the older brother of a high-profile Serbian politician named Nikola Selakovic, who serves as the Secretary to the President of Serbia named Alexander Vucic.

Serbian President Alexander Vucic's brother named Andrej Vucic, is purported to be a Serbian Arms dealer, and a close business partner and associate of Slobodan Tesic ("TESIC").

As evidence in investigative veteranstoday.com's news article entitled, *"Republic of Serbia Arming Daesh"* that can be viewed on the website link below;

VICTIMS' EMERGENCY PETITION FOR ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT, 18 U.S.C. SECTION 3771

https://www.veteranstoday.com/2017/08/25/republic-of-serbia-arming-daesh/

On December 19, 2019, the U.S. Department of The Treasury issued a press-release entitled, "*Treasury Sanctions Corruption and Material Support Networks*" that states in relevant part;

*"Slobodan Tesic (Tesic) was identified in the annex of E.O. 13818 on December 21, 2017.  At the time of his designation, Tesic was among the biggest dealers of arms and munitions in the Balkans, spending nearly a decade on the United Nations (UN) Travel Ban List for violating UN sanctions against arms exports to Liberia.  In order to secure arms contracts with various countries, **Tesic would directly or indirectly provide bribes and financial assistance…"***

It can be viewed on the website link below;

https://home.treasury.gov/news/press-releases/sm849

To support the Petitioner's claims regarding David and Nikola Selakovic's close personal ties Mr. Tesic, according to an online news article entitled, "*Serb arms dealer donated tractors to Kosovo Serbs to win license to export weapons to Armenia,*" Nikola Selakovic personally delivered gifts on behalf of Mr. Tesic to citizens of  Kosovo, that states in relevant part;

"*On January 20, four days after the assassination of Oliver Ivanovic, the President of Serbia ("VUCIC")visited Kosovo and promised aid to the people, including tractors. Only two months later, the keys to the new tractors, as well as the vans, provided by Slobodan Tesic, were presented by the Residence & Secretar, Nikola Selakovic,"...*

That news article can be viewed on the website link below;

https://kossev.info/serbian-mp-serb-arms-dealer-donated-tractors-to-kosovo-serbs-to-win-license-to-export-weapons-to-armenia/

The Petitioners' assert, it is not outside the realm of possibility that Selakovic may have utilized his High-Powered political connections with Serbian President Alexander Vucic, and Slobodan Tesic, who, the U.S. Department of The Treasury found maintains a well-established history of engaging in bribery and corruption at the highest levels of government, to avoid any potential criminal liability to date.

//

//

//

VICTIMS' EMERGENCY PETITION FOR
ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT,
18 U.S.C. SECTION 3771

3

**PETITIONERS' ONGOING CONCERNS REGARDING POTENTIAL DEFERRED PROSECUTION OR PLEA AGREEMENT(S) THAT THE GOVERNMENT MAY HAVE REACHED WITH THE WELL-HEELED DEFENDANTS IN THIS ACTION IN VIOLATION OF CRVA**

Upon information and belief PETITIONERS assert that DEFENDANTS may have engaged in deferred prosecution agreement discussions or plea negotiations with the Office of the United States Attorney for the Central District of Missouri concerning federal crimes which the DEFENDANTS, and others are alleged to have committed against Adobe Systems ("ADOBE"), The Microsoft Corporation ("MICROSOFT"),  and the PETITIONERS, [PETITIONER GUSTAVO ESCAMILLA owns a majority interest in PETITIONER'S GREENWAY NUTRIENTS, INC.]  Such negotiations may likely result in a disposition of the charges.

Under the CVRA, before and after any criminal charges are filed against the DEFENDANTS, the PETITIONERS have the rights (among others) to notice of their rights under the CVRA, to confer with the prosecutors, and to be treated with fairness.

As soon as charges are filed, the PETITIONERS have the rights (among others) to timely notice of court proceedings, the right not to be excluded from such proceedings, the right to be heard at such public proceedings regarding conditions of release, any plea, and any sentence, the right to confer with the attorney for the government, the right to restitution, and the right to be treated with fairness and with respect for the PETITIONERS' dignity and privacy.

PETITIONERS have been denied their rights under CVRA for the following reasons:

    a.   No consultation with government attorney;

    b.   No notices of any public court proceedings;

    c.   No information regarding the disposition of charges;

    d.   No information regarding the right to restitution; and

    e.   No notice of rights under CVRA.

Moreover, the PETITIONERS assert that federal law enforcement officials failing to inform or advise the PETITIONERS of their crime victims' rights under the CRVA have hindered, if not all but eliminated, any meaningful opportunities for the PETITIONERS to participate in any potential victim's assistance programs, or any available victim's restitution under the Mandatory Restitution Act of 1996, 18 U.S. Code §3663A.

The PETITIONERS are in jeopardy of losing their rights under the CRVA, as described above, if the government is able to negotiate a plea or agreement with the well-heeled DEFENDANTS, without the PETITIONERS' participation and knowledge.

WHEREFORE, for the reasons outlined above, the PETITIONERS respectfully request this Court to grant their Petition, and to order the United States Attorney to comply with the provisions of the CVRA prior to and including any plea or other agreement with the DEFENDANTS, or the PETITIONERS' former attorneys, and any attendant proceedings.

## FACTUAL BACKGROUND

1. In March of 2015, ESCAMILLA, who is a majority owner, formulator, and developer of his company GREENWAY's products, was contacted via email by Federal law enforcement officials with the DHS. [please see Exhibit A]

2. Pursuant to said email, ESCAMILLA and his business partner met face to face with DHS officials regarding his criminal trademark infringement complaint filed against SELAKOVIC, BLACKBURN, and entities operated and controlled by the DEFENDANTS.

3. The DHS Acting Agent In Charge of the PETITIONERS' criminal investigation named Shawn Gibson ("GIBSON"), DHS Field Agent Carlos Suarez ("SUAREZ"), and one other DHS agent, attended and recorded the interview.

4. During the PETITIONERS' interview, DHS Officials informed him that his company had been identified as a victim of the alleged criminal acts that were to be included in one of the

VICTIMS' EMERGENCY PETITION FOR ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT, 18 U.S.C. SECTION 3771

largest software piracy schemes ever prosecuted by federal law enforcement officials, called "*Operation Software Slashers*"("OSS"), which was being conducted in Federal court in Western District of Missouri.

5.      DHS officials were referred to the PETITIONERS by Microsoft and Adobe, who have also been victimized by the DEFENDANTS, other unnamed suspects, and entities operated or controlled by the DEFENDANTS who conducted unlawful manufacturing, distributing and reselling of millions of dollars' worth of counterfeit, fake, grey market, or unauthorized versions of software bearing Microsoft's and Adobe's trademark.

6.      DHS officials were aware that the ESCAMILLA was instrumental in personally supplying key material evidence and information to Adobe and Microsoft surrounding DEFENDANTS, and entities operated or controlled by the DEFENDANTS with respect to the DEFENDANTS' illegal manufacturing, distribution, and software sales activity.

7.      ESCAMILLA became part and parcel of OSS, when he was informed by DHS officials that the Federal prosecutor in the Western District of Missouri agreed to prosecute his federal criminal trademark infringement complaint against DEFENDANTS, other unmanned suspects and corporate entities operated or controlled by DEFENDANTS.

8.      During ESCAMILLA's interview, DHS officials also advised Escamilla and his business partner that:

a.      SELAKOVIC and BLACKBURN were the alleged **ringleaders responsible for OSS**;

b.      In or around January of 2015, federal charges and **sealed federal criminal indictments** had already been filed against SELAKOVIC, BLACKBURN, and entities operated and controlled by the DEFENDANTS.

9.      DHS officials advised ESCAMILLA that the Government's criminal prosecution of the DEFENDANTS and others would be concluded sometime in or about November - December of 2015.  This turned out to be untrue.

10. DHS Agent Gibson, advised ESCAMILLA that he, and his business partner, need not worry about having to file another costly federal civil lawsuit against DEFENDANTS or any other entities operated and controlled by DEFENDANTS because his company GREENWAY would be identified as the "*Lead Victims*", in conjunction with *Microsoft and Adobe,* in the Government's Federal criminal case in connection with *OSS* going forward.

11. DHS officials informed ESCAMILLA that his company GREENWAY would be eligible for compensatory damages from the more than $20,000,000 that DHS and the United States Department of Justice ("DOJ") officials had successfully seized during a civil asset forfeiture proceedings against six (6) other individual suspects and entities that had already pleaded guilty to criminal charges in connection with OSS.

12. As evidenced in the following the DOJ press release, entitled "*Operation Software Slashers: Six Defendants Plead Guilty to $100 Million Software Piracy Scheme*", can be viewed on the website link below, that states, in part:

https://www.justice.gov/opa/pr/operation-software-slashers-six-defendants-plead-guilty-100-million-software-piracy-scheme

*"U.S. Attorney Tammy Dickinson of the Western District of Missouri announced today that a Seattle man became the sixth defendant convicted in federal court for his role in one of the largest software piracy schemes ever prosecuted by the U.S. Department of Justice…."*

*"Investigators seized more than $20.6 million in assets, including $10,188,777 seized from bank and investment accounts, 10 luxury automobiles and 27 parcels of real estate with a total market valuation of $9,739,399, through federal forfeitures. Affidavits filed in those forfeiture complaints estimate that conspirators reaped about $30 million in profits from customers who paid more than $100 million for the software…"*

13. On or about June 16, 2015, ESCAMILLA emailed DHS Agents Gibson and Suarez advising them that a Colorado civil lawsuit that included allegations of trademark infringement filed by GREENWAY against DEFENDANTS, other individuals, and corporate entities operated and controlled by DEFENDANTS, was in jeopardy of being dismissed. [Please see Exhibit B]

14. ESCAMILLA advised DHS Agents Gibson and Suarez that he was financially devastated by the ongoing and illegal sales of GREENWAY's products, illegally bearing GREENWAY's registered trademark back to GREENWAY's customers at significantly reduced pricing for years by the DEFENDANTS. This caused ESCAMILLA financial hardship where he was no longer able to afford to pay for a private civil attorney to pursue damages in its Colorado federal civil case. As such, this case was dismissed for failure to prosecute. *See Greenway Nutrients, Inc. v. et al, Case #1:13-cv-01088*

15. On or about June 17, 2015, DHS Agent Gibson sent ESCAMILLA an email stating in part,

*"Mr. Escamilla,*

*I am truly sorry for the strain that has been placed on you and your family. I can't claim to understand the issues that you are facing on a daily basis, but know that we are working on ensuring that those that have violated Federal law will have their day in court to answer to allegations. Why I can't go into detail about our investigative objectives, know that we have been working on this case daily since our meeting and we are making progress. Having been in law enforcement for almost 2 decades I know that you are probably frustrated by the speed of the judicial process, but like we explained at the meeting it is going to take time. I know my words are of little solace considering you are facing eviction, but I assure you we are moving forward and your situation has not been forgotten…"* *"Just know that the investigative steps we are taking today will help build a bigger and stronger case against those involved and we truly appreciate your assistance…"* [Please see Exhibit C]

Subsequently, ESCAMILLA provided DHS officials with material evidence demonstrating the unlawful manufacturing, distribution and sales by DEFENDANTS and his entities, of substantial amounts of GREENWAY's products bearing GREENWAY's trademark. All done without compensation to Escamilla or Greenway and without GREENWAY's permission or knowledge. [Please see Exhibit D]

**DHS AGENT GIBSON ADVISED ESCAMILLA TO OBTAIN A FAVORABLE CIVIL COURT RULING OVER DEFENDANTS BEFORE DHS OR DOJ WOULD CONSIDER FURTHER INVESTIGATION.**

16.     Curiously, over a year later, ESCAMILLA went from being told that GREENWAY would be the Lead Victim in the Government's criminal case in connection with OSS, to being informed that he would have to file a very costly federal civil lawsuit on behalf of GREENWAY to justify any further Federal criminal investigation or prosecution by DHS or the DOJ against DEFENDANTS.

17.     On or about October 28, 2016, DHS Agent Gibson sent ESCAMILLA an email to that effect:

"*We have researched your claims and consulted with the United States Attorney's Office, Western District of Missouri and while we sympathize with your situation, we have been advised that on <u>August 17, 2015 a District Court found in favor of Selakovic against Greenway Nutrients in regards to the assertion of the Greenway trademark.</u> While we understand that you may disagree with this judgement, our agency is bound by decision of the court and therefor are restricted on what we can do in regard to your claims that they continue to sell your products illegally... Regardless, we continue to investigate the alleged criminal activities in regard to his alleged distribution of counterfeit software.*" [Please see Exhibit E]

18.     That same day, ESCAMILLA advised DHS Agent Gibson that the court in GREENWAY's Colorado civil court case had issued <u>no such ruling</u> in favor of SELAKOVIC, and that DHS Agent Gibson was either mistaken or was taking advantage of ESCAMILLA because he is a <u>Mexican-American</u> small businessman who was not represented by private legal counsel.

*19.*     ESCAMILLA advised DHS Agent Gibson that the only apparent ruling that ever referenced anything remotely close to a ruling in favor of SELAKOVIC was a federal magistrate's "*recommendation*" that GREENWAY's Colorado civil suit be dismissed with

VICTIMS' EMERGENCY PETITION FOR ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT, 18 U.S.C. SECTION 3771

prejudice.  Colorado Chief Justice Marcia Kreiger, who presided over GREENWAY's Colorado civil suit, Greenway Nutrients, Inc. vs. BLACKBURN, Case# 1:13-cv-01088, Docket Entry 155. Judge Kreiger felt otherwise stating in part:

*"The Court notes that at the time the case was dismissed for the Plaintiffs failure to maintain a valid address or to obtain counsel, its claims for **trademark infringement, false designation of origin, and unjust enrichment were still viable. These claims were not adjudicated on the merits** and the Court therefore cannot find that the suit was unfounded or groundless…"* [Please see Exhibit F]

20.     The court also ruled that Greenway maintained personal jurisdiction over Selakovic during Greenway's Colorado suit.

21.     On or about November 21, 2016, Gibson sent another email to ESCAMILLA, once again, offering misleading and incorrect legal advice by advising him that GREENWAY would be required to prevail in a Colorado District Court against SELAKOVIC before DHS or DOJ officials could move forward with any investigation into allegations of unlawful manufacturing, distribution, of Greenway's products bearing Greenway's trademark by Selakovic, and Selakovic's companies unlawful sales of copious amounts of counterfeit, fake, or unauthorized versions of GREENWAY's products, bearing Greenway's registered trademark.  This email stated in part:

*"**Why I understand your frustration and concerns, <u>our agency cannot move forward with any investigation involving your trademark</u> until you resolved this issue with the <u>District Court in Colorado</u> that issued the decision.  I take offense to the insinuation that I am avoiding your email to deprive your rights.  I have never once avoided your emails or questions..."*

*"You assert allegations against this department, as well as myself and my staff, that we have ignored you and proactively tried to take advantage of you, which couldn't be further from the truth.  We have, and continue too, since the day we met with you to seek charges against Selakovic in Singapore for his alleged sale of illicit software…"*

VICTIMS' EMERGENCY PETITION FOR ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT, 18 U.S.C. SECTION 3771

10

*"Additionally, we have made attempts to look into the alleged misuse of the Greenway Nutrients logo, but because of the court decision, <u>in a case you were a party to in Colorado,</u> would not be able to file charges at this time,… We would be happy to take a second look if that decision is reversed…"*

[Please see Exhibit G]

22.     ESCAMILLA once again advised DHS Agent Gibson that **<u>NO</u>** such ruling in favor of **<u>SELAKOVIC</u>** ever took place during GREENWAY's Colorado civil suit regarding Greenway's trademark. And, that Gibson was either mistaken or taking advantage of Escamilla because he is a <u>Mexican American</u> small businessman who was not represented by private legal counsel.

**ESCAMILLA DISCOVERED THAT GREENWAY'S FORMER ATTORNEY AND DEFENDANTS EMBEZZLED GREENWAY's CONFIDENTIAL REVERSE-MERGER PLANS AND BUSINESS INFORMATION FOR THEIR SELF-DEALING GAIN**

23.     In or around March of 2017, Escamilla notified DHS Agent Gibson via email to advise Gibson that he had discovered that Michael J. Ryan ("Hereinafter MR"), who Escamilla, on behalf of Greenway, hired to assist with the formal drafting and preparation of a Private Placement Memorandum ("PPM"), had violated his company's non-disclosure agreement intentionally, breaching MR's fiduciary obligations to keep Greenway's attorney-client privileged information confidential.

24.     Escamilla provided material evidence to DHS Agent Gibson demonstrating that Escamilla engaged MR, and his brother named Thomas F. Ryan ("Hereinafter TR"), to assist him to first prepare a PPM, with the intentions of later taking Greenway public through a proposed reverse-merger deal with a over-the-counter publicly-traded shell corporation named Vegalab, Inc, (Hereinafter VEGL, then named HPC Acquisitions Inc.)

25.     The Petitioner advised DHS Agent Gibson that before performing any legal work on behalf of the PETITIONER'S, or his company, Escamilla required both MR, and TR, to execute his company's non-disclosure agreement that contractually obligated MR, TR, as well as their

brother and law partner, named James Daniel Ryan ("Hereinafter JR"), to keep Greenway's business information confidential forever.

26.    Within months of completing his company's PPM, TR introduced ESCAMILLA and his company to SELAKOVIC and BLACKBURN as potential distributors of Greenway's products and investors in his company's PPM.

27.    TR and MR assisted ESCAMILLA and his company in drafting and signing several contractual agreements by and between SELAKOVIC, BLACKBURN and entities owned or controlled by the SELAKOVIC.

28.    It was around that time that ESCAMILLA also discovered that MR had switched sides, interfered with GREENWAY's confidential business relationship with representatives from ECOWIN, and VEGL, and unlawfully assisted SELAKOVIC in taking VEGL public, instead, and in place of his company.

29.    MR also had unlawfully taken stock ownership in VEGL, embezzled confidential insider business information obtained during ESCAMILLA's and his company's confidential reverse-merger discussions with representatives from VEGL that MR, SELAKOVIC, BLACKBURN, and entities operated by controlled by the SELAKOVIC, later converted for their self-dealing gain.

30.    ESCAMILLA informed Agent Gibson of these developments and requested assistance. Agent Gibson ignored and refused to take any action.

**AFTER RECEIVING NO RESPONSE, ESCAMILLA FILED A FEDERAL CIVIL RIGHTS COMPLAINT WITH DHS'S OFFICE OF CIVIL RIGHTS AND CIVIL LIBERTIES**

31.    On or about May 1, 2017, ESCAMILLA, following the Government's civil rights complaint reporting protocols, filed a civil rights complaint with DHS's Office of Civil Rights and Civil Liberties ("CRCL") against DHS Agent Gibson on behalf of GREENWAY.

32.    The complaint alleged that Agent Gibson and DHS officials were depriving ESCAMILLA and GREENWAY of any lawful due process or rights to their property, and were

VICTIMS' EMERGENCY PETITION FOR ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT, 18 U.S.C. SECTION 3771

ignoring newly obtained material evidence that should have negated DHS's and DOJ's previous erroneous legal conclusion not to proceed forward with the *criminal trademark* infringement complaint against DEFENDANTS.

33.     The complaint further alleged that DHS Agent Gibson and DHS officials were taking advantage of ESCAMILLA because he is a <u>Mexican American</u> small businessman who was not represented by private legal counsel.

34.     On or about May 2, 2017 CRCL advised ESCAMILLA that the department did **<u>NOT</u>** have jurisdiction over his civil rights complaint.  CRCL made this abrupt decision without ever interviewing ESCAMILLA.  Even though "under 6 U.S.C § 345 and 42 U.S.C. § 2000ee-1 CRCL is responsible for reviewing and assessing information concerning <u>abuses of civil rights,</u> civil liberties, and profiling on the **<u>basis of race,</u>** ethnicity, or religion, by employees and officials of DHS," it offered no explanation for its decision. [Please see Exhibit H]

35.     Officials with CRCL also failed to protect or advise ESCAMILLA of his crime victims' rights as mandated by the CRVA.

**ESCAMILLA CONTACTED DHS'S RESIDENT AGENT IN CHARGE OF DHS'S OFFICE OF PROFESSIONAL RESPONSIBILITY ("OPR"), WHO CONTRADICTED DHS AGENT GIBSON'S MISREPRESENTATIONS THAT SERVED AS THE BASIS FOR DHS AND DOJ REFUSING TO INVESTIGATE OR PROSECUTE HIS COMPANY'S CRIMINAL TRADEMARK INFRINGEMENT COMPLAINT**

36.     On or about July 27, 2017, ESCAMILLA advised DHS Agent Gibson that he was escalating his concerns regarding the deprivation of his civil rights to the DHS' Los Angeles field Office of OPR.

37.     Shortly thereafter, ESCAMILLA spoke with DHS OPR Resident Agent in charge named Mr. Russell Simons ("SIMONS").

38.     On or about August 3, 2017, during one of the ESCAMILLA's phone calls with SIMONS, he and SIMONS reviewed GREENWAY's Colorado federal civil court case docket.

Please see the website link below: https://www.pacermonitor.com/case/1534624/Greenway Nutrients, Inc v BLACKBURN et al

39.     After reviewing GREENWAY's Colorado civil court docket, DHS Resident Agent SIMONS initially agreed with ESCAMILLA that **NO** favorable court ruling was ever issued in favor of SELAKOVIC by the court regarding Greenway's trademark, during his company's previously filed Colorado civil court case.  SIMONS informed ESCAMILLA that he was going to talk to Agent Gibson and will get back to ESCAMILLA.

40.     On or about August 4, 2017, SIMONS spoke with Escamilla sounding agitated, contradicted DHS's Agent GIBSON's faulty-at-best legal advice that DHS Agent Gibson's *repeatedly* asserted allegedly served as the basis for DHS' or DOJ' refusing to investigate Greenway's criminal trademark infringement complaint, by informing ESCAMILLA that he knew Agent Gibson personally and advised Escamilla of the following by stating in relevant part;

"*while there may not have ever been any actual adverse legal decision ruling against Greenway trademark, there was no actual ruling or legal decision that ruled in favor of Greenway! trademark that clearly stated that Greenway owned the rights to its valid US trademark.*"…

41.     Escamilla advised SIMONS that Greenway is the owner and holder of a registered trademark in the name "Greenway Nutrients", Serial #85142469, and what SIMONS was attempting to the now mislead Escamilla to believe was untrue.

42.     Escamilla then requested that SIMONS provide Escamilla with SIMONS government issued email address so that the PETITIONER'S could provide Simons with evidence to the contrary, that SIMONS refused to provide to Escamilla and further stated something to the effect;

*"You can file anything you want to because I am not going to do anything with any of it anyway."*

43.     Escamilla then advised SIMONS that he and GIBSON, had now switched-up their stories, and were taking advantage of Escamilla because he is a Mexican-American small

VICTIMS' EMERGENCY PETITION FOR
ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT,
18 U.S.C. SECTION 3771

14

businessman, who was not represented by private legal counsel, and that SIMONS, and GIBSON were intentionally depriving the PETITIONER'S of any lawful due process, or protection from further harm caused by the DEFENDANTS, and now his company's former attorney MR.

44.    In response, ESCAMILLA sent Simons a letter memorializing his conversations with SIMONS via US express mail, so he could document SIMONS depriving him of his civil rights in violation of 42 U.S. Code, Section 1983. [Please see Exhibit I]

### ESCAMILLA FILED A FEDERAL CIVIL RIGHTS LAWSUIT AGAINST DHS OFFICIALS PURSUANT TO 42 U.S. CODE § 1983, DEPRIVATION OF CIVIL RIGHTS WHILE ACTING UNDER THE COLOR OF LAW

45.    On October 24, 2017, ESCAMILLA filed a civil rights lawsuit against DHS, pursuant to 42 U.S. Code § 1983. *See Gustavo Escamilla et al v. Department of Homeland Security et al civil case #2:17-cv-07748*

46.    ESCAMILLA alleged that his company's former attorney MR, SELAKOVIC, and entities owned or controlled by SELAKOVIC, embezzled Greenway's attorney-client privileged information obtained during confidential reverse-merger discussions between ESCAMILLA, GREENWAY and representatives from VEGL, for their own personal gain.

47.    ESCAMILLA further alleged that MR flagrantly violated GREENWAY's non-disclosure agreement, had switched sides, and was unlawfully representing SELAKOVIC and VEGL (then HPC Acquisitions, Inc.)

48.    Instead of DOJ or DHS officials advising Escamilla or Greenway of their crime victim's rights as mandated under CVRA, DHS filed a motion to dismiss his civil rights lawsuit.

49.    On or about April 4, 2018, the court ruled in favor of DHS's motion to dismiss and dismissed this suit with prejudice.

//

//

//

VICTIMS' EMERGENCY PETITION FOR ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT, 18 U.S.C. SECTION 3771

15

**BASED ON DHS AGENT GIBSON'S INCORRECT LEGAL ADVICE, GREENWAY FILED ANOTHER FEDERAL CIVIL LAWSUIT IN THE SOUTHERN DISTRICT OF FLORIDA**

50.     On or about August 18, 2018, GREENWAY filed suit against GREENWAY's former attorneys MR and JR, as well as against SELAKOVIC, BLACKBURN, his company's former supplier named Ecowin Co., LTD, (Hereinafter ECOWIN"), an over-the-counter publicly-traded entity majority owned by the SELAKOVIC, named Vegalab, Inc. ("Hereinafter VEGL"), and other entities operated and ultimately controlled by the SELAKOVIC, in the Southern District of Florida ("hereinafter Florida Suit"). *See Greenway Nutrients, Inc. vs. Selakovic et al., #9:18-cv-81104*

51.     GREENWAY engaged Los Angeles, California area based attorney John M. Pierce (hereinafter "PIERCE"), and his law firm named Pierce Bainbridge Beck Price & Hecht, LLP. (hereinafter "PIERCE BAINBRIDGE"), to represent his company.

52.     PIERCE BAINBRIDGE Partner, Jonathan Sorkowitz (hereinafter "SORKOWITZ") acted as co-counsel with PIERCE during the Florida suit.

53.     Attorney Ronald Nisonson (hereinafter "NISONSON"), with the law firm named Ward, Damon, Pheterson and Bleau, PL., (hereinafter "WDPB") served as local Florida counsel.

54.     GREENWAY's Florida suit centered around GREENWAY's other former attorney named James Ryan (Hereinafter JR), the brother and law partner of MR, who had also violated GREENWAY's non-disclosure agreement and conspired with MR, SELAKOVIC, ECOWIN, and representatives of VEGL, to intentionally interfere with GREENWAY's exclusive distribution agreement with ECOWIN, causing PETITIONERS millions of dollars in financial losses and devastating GREENWAY's opportunity to go public.

**JR ENGAGES IN A BRAZEN PATTERN OF DISHONEST BEHAVIOR**

55.     On or about September 5, 2018, after being served with GREENWAY's Florida suit, JR, sent Pierce, Sorkowitz, Nisosnon, WDPB, and Pierce Bainbridge, an email, denying that he or

his brother MR, had ever received or reviewed any confidential information or represented the PETITIONERS or any entity owned by the ESCAMILLA, stating in part:

• *"I am in receipt of your complaint and I want to be clear I am going to be very short on the curtesy I extend before I begin pursuing sanctions…"*

• **"Your allegation that my brother Michael, my firm or I ever represented Greenway Nutrients, Inc. (Greenway) is false. That never happened. Nor did we receive any confidential information from Greenway, or any other entity operated by Mr. Escamilla…"**

• *"My brother Tom has never been a member or associate of my firm…"*

[Please see attached, Exhibit J]

55.     JR also threatened to file a Rule 11 Motion For Attorney's Fees And Costs, if Pierce, Sorkowitz, Nisosnon, WDPB, and Pierce Bainbridge, did not agree to immediately dismiss their suit.

## ESCAMILLA PROVIDED COUNSEL WITH EVIDENCE IN SUPPORT OF THE LAW SUIT

56.     Due to JR's meritless threats, ESCAMILLA provided Pierce, Sorkowitz, Nisosnon, WDPB, and Pierce Bainbridge, with additional fourteen (14) exhibits in the form of email communications, distribution agreements, and various contracts that were drafted on behalf of GREENWAY by MR and TR, while being law partners with their brother JR. [Please see Exhibits K, 1-14]

57.     Escamilla had also provided Pierce, Sorkowitz, Nisosnon, WDPB, and Pierce Bainbridge with evidence that after TR, MR, and JR assisted Escamilla to complete Greenway's PPM, JR, MR, and TR, had determined Greenway's estimated market value at approximately $25,000,000 at that time.

58.     Pierce, Sorkowitz, Nisosnon, WDPB, and Pierce Bainbridge were also in possession of a private stock solicitation letter offering a seventeen and a half percent (17.5%) equity interest

VICTIMS' EMERGENCY PETITION FOR
ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT,
18 U.S.C. SECTION 3771

stake in exchange for a four and a half million dollar ($4,500,000) investment in Greenway's PPM that JR prepared and sent to his clients during TR's, MR's, and JR's representation of Greenway.

59.     Notwithstanding Escamilla advising counsel of his obvious concerns regarding JR's fraudulent denials, Pierce, Sorkowitz, Nisosnon, WDPB, and Pierce Bainbridge, allowed JR to represent himself, MR, VEGL, Selakovic, Blackburn, and other entities owned or controlled by the Selakovic, during Greenway's Florida suit. This was a clear conflict of interest and was a severe detriment to Escamilla's and Greenway's best interest.

60.     Prior to filing the Florida suit, ESCAMILLA also provided Pierce, Sorkowitz, and Pierce Bainbridge with a signed witness statement from one of the SELAKOVIC's former employees that the former employee witnessed SELAKOVIC direct employees to sell copious amounts of the GREENWAY's products illegally bearing GREENWAY's trademark back to the GREENWAY's customer base.

61.     This former employee also stated that SELAKOVIC also personally advised him that they had agreed to purchase GREENWAY's former supplier named Ecowin for a purported thirty million dollars ($30,000,000.00) and that Selakovic and Blackburn wanted to move away from the sales of software and into the organic pesticide and fungicide industry. [Please see Exhibit L]

On or about September 18, 2014, SELAKOVIC issued a press release entitled, "David Selakovic Expands Vegalab's Global Positioning Through Ecowin Acquisition."

[https://finance.yahoo.com/news/david-selakovic-expands-vegalabs-global-090000520.html]

62.     This press release announced that a company that SELAKOVIC solely owned had purchased GREENWAY's former supplier Ecowin.  These acts directly violated GREENWAY's nondisclosure agreements.

**ESCAMILLA PROVIDED EVIDENCE TO COUNSEL DEMONSTRATING BAD ACTORS CONSPIRED TO GO AROUND HIS BACK TO TAKE VEGL PUBLIC, IN DIRECT VIOLATION OF GREENWAY'S NON-DISCLOSURE AGREEMENTS**

63.     ESCAMILLA provided Pierce, Sorkowitz, and Pierce Bainbridge, with evidence demonstrating that in March of 2012, and before finalizing his company's exclusive distribution agreement with Ecowin, that TR and MR, had also assisted him and his company in drafting his company's exclusive distribution agreement with Ecowin.

64.     ESCAMILLA also provided counsel with evidence demonstrating that on or about October 2012, SELAKOVIC and representatives from VEGL improperly contacted Ecowin and entered into a secondary and secret distribution agreement with Ecowin, in violation of GREENWAY'S non-disclosure agreement.

65.     This unlawful distribution agreement expressly identified SELAKOVIC as the personal owner of the exclusive rights to market and distribute Ecowin's products, instead, and in place of the ESCAMILLA's company. [Please see Exhibit M]

66.      The distribution agreement that SELAKOVIC, Ecowin, and representatives from VEGL conspired to enter into secretly, also identified VEGL, as a suitable corporate vehicle that SELAKOVIC, Ecowin, and VEGL agreed in writing to utilize to unlawfully take VEGL's business model public, which they did at a later date.

67.     In March of 2016, SELAKOVIC, entities controlled by SELAKOVIC, and MR, executed ESCAMILLA 's companies confidential reverse-merger plans with VEGL, and took VEGL public without ESCAMILLA's, or his company's knowledge, authorization, or consent, embezzling his company's confidential information for their self-dealing gain.

68.     According to an April 2, 2018, online interview, SELAKOVIC publicly admitted to creating, and raising funds through a separate PPM in March of 2016, while taking VEGL, (*then HPC Acquisitions, Inc.*) public.

69.     SELAKOVIC also publicly stated:

VICTIMS' EMERGENCY PETITION FOR
ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT,
18 U.S.C. SECTION 3771

"*Starting the evolution, HPC Acquisitions (Now VEGL), then majority owned by myself (now CEO), raised funds in a private placement around March of 2016, which spearheaded the growth and marketing of Vegalab products.*"…This online news article and interview entitled "Vegalab CEO David Selakovic Exclusive Interview Published in OTC Markets Newsletter". [http://otcmarketsgroup.cmail20.com/t/ViewEmail/i/52363FF4B33712DC2540EF23F30FEDED/B70F8B7C328529F720B193FBA00ED1DB]

70.     On or about January 9, 2019, and due to JR's repeated threats of filing a meritless Rule 11 Motion, ESCAMILLA once again provided Pierce, Sorkowitz, and Pierce Bainbridge with an email that included an additional six (6) exhibits further demonstrating that an attorney-client relationship existed by and between his company, JR, MR, and their law firm. [Please see Exhibit N]

71.     Included in ESCAMILLA 's six (6) additional exhibits is a critical non-disclosure/non-circumvent agreement (hereinafter "NDNCA") that TR, the brother and law partner of JR, prepared and had ESCAMILLA sign before holding any confidential reverse-merger discussions with a representative from VEGL, named Eric Hanson, who was operating under the corporate entity and name US Strategy Inc. (hereinafter "USI").

72.     ESCAMILLA's and GREENWAY'S NDNCA with USI and Eric Hanson, who was representing VEGL, stated that Eric Hanson, or any representative from USI, were entirely restricted from utilizing any of his company's confidential business information that included his company's reverse-merger and publicly-traded entity formation strategy with VEGL for any purpose other than to conduct business with his company.

73.     ESCAMILLA's NDNCA also stated that Eric Hanson, USI, and VEGL, were restricted from interfering with any of his company's confidential business relationships in any capacity. Namely Ecowin. [Please see Exhibit N]

74.     Also included in ESCAMILLA exhibits *(Exhibit N)* is an email from TR, who was JR's law partner during that period, to Eric Hanson and USI, and is one of well over a dozen pieces of material evidence that Pierce, Sorkowitz, and Pierce Bainbridge, had in their possession that absolutely countered JR and MR's repeated denials of supposedly never having received or reviewed any information or representing ESCAMILLA's company:  It states in part;

"*Eric and Nance*

*I enjoyed discussing* what our company, **Greenway Nutrients** *is doing.*"

"*...2012 is going to be a great year.*"...

*Tom Ryan*

75.     Pierce, Sorkowitz, Nisonson, WDPB, and Pierce Bainbridge, later deliberately concealed GREENWAY's NDNCA that JR's brother and law partner TR had him sign prior to holding any confidential reverse-merger discussions with Eric Hanson and USI, before abruptly abandoning GREENWAY's Florida suit.

### JOHN PIERCE AND PIERCE BAINBRIDGE DEMANDED THAT ESCAMILLA AGREE TO CONSENT TO RELEASE JR AND MR FROM THE FLORIDA SUIT OR THEY WILL WITHDRAW AS ATTORNEYS OF RECORD

76.     On or about February 14, 2018, the court ruled in GREENWAY's favor, finding that his GREENWAY's former attorneys JR, MR, and their law firm could be held accountable to GREENWAY for breach of fiduciary duty and tortious interference claims, further noting that JR "*had flagrantly misquoted the law*."

77.     The court also ruled that Greenway's civil **trademark infringement** and unjust enrichment claims were still viable. ***See Greenway Nutrients, Inc. vs. Selakovic et al., #9:18-cv-81104 Docket Entry 81***

78.     On or about March 5, 2019, GREENWAY prevailed against its former supplier Ecowin, who **defaulted** after being properly served.

79. On or about March 6, 2019, Pierce, Sorkowitz, and Pierce Bainbridge sent ESCAMILLA an email that utterly blindsided him, by demanding that he agree to consent to release JR, MR, and their law firm from his company's Florida suit, otherwise, Pierce Bainbridge, and WDPB, would be notifying the court of their intentions to withdraw as counsel of record on behalf of his company. [Please see Exhibit O]

80. Moreover, Pierce, Sorkowitz, and Pierce Bainbridge went so far as to deny in writing ever receiving any material evidence from ESCAMILLA demonstrating that an attorney-client relationship existed between his company, JR and MR. This was in complete disregard of GREENWAY's NDNCA and other material evidence central to the Florida suit.

81. Pierce, Sorkowitz, and Pierce Bainbridge, also advised ESCAMILLA that it would be *too costly* to defend against JR's *threats* of filing a RULE 11 Motion For Sanctions For Attorney's Fees And Costs.

82. ESCAMILLA repeatedly provided evidence to counsel contradicting JR's statements in JR's September 5, 2018 email to counsel.

83. Pierce, Sorkowitz, Nisosnon, WDPB, and Pierce Bainbridge knew that JR, MR, and TR, had determined Greenway's estimated market value at approximately twenty-five million dollars ($25,000,000) during JR's, MR's, and TR's, representation of Greenway.

84. They also knew that JR had previously sent his clients a private stock solicitation letter offering a seventeen and a half percent (17.5%) equity interest stake in exchange for a four and a half million dollar ($4,500,000) investment in Greenway's PPM.

85. On or about March 6, 2019, the court requested that Pierce Bainbridge and WDPB, supply the court with a Motion for Default Final Judgment ("MDFJ") as to Ecowin's liability, or a Notice of Joint Liability as to the JR, MR, and their law firm's potential liability in connection with Ecowin's default. This was due on or by March 28, 2019.

86. On or about March 7, 2019, ESCAMILLA and his business partner met with John Pierce who promised to provide an expert witness to adequately assess Ecowin's liability that was to be included in his company's MFDJ against Ecowin.

87. Escamilla and his company justifiably relied on Pierce's promise. Pierce later backed out on his promise to provide ESCAMILLA's company with an expert witness to adequately assess Ecowin's potential liability. [Please see Exhibit P]

**ECOWIN DID BUSINESS WITH AN ENTITY OPERATED BY BLACKBURN, AND CONTROLLED BY SELAKOVIC WITHOUT ANY COMPENSATION TO ESCAMILLA OR GREENWAY**

88. On or about March 11, 2019, ESCAMILLA supplied Pierce, Sorkowitz, and Pierce Bainbridge, with copies of Ecowin's international shipping records, demonstrating that during the period that Ecowin was contractually obligated to supply Ecowin's products to GREENWAY, Ecowin had unlawfully supplied a company operated by BLACKBURN, and controlled by SELAKOVIC with thousands of gallons of Ecowin's highly-concentrated base products instead.

89. Ecowin's secret and unlawful shipments to the bad actors instead of ESCAMILLA's company was worth an estimated retail market value in excess of **one hundred million dollars ($100,000,000.00),** that Ecowin, Selakovic, Blackburn, and entities operated and controlled by Selakovic, illegally benefited from without any compensation to ESCAMILLA, or his company. [Please see Exhibit Q]

90. ESCAMILLA then respectfully requested that Pierce provide him with an estimated amount of monetary damages that Ecowin could potentially be liable for that Pierce and Pierce Bainbridge intended to provide to the court.

91. Instead of simply responding to ESCAMILLA's email request Pierce became upset and stated in part:

*"Carolynn or some partner you need to deal with this. I am closing massive deal this week. Gus…Litigation is a fluid process. It is intellectual combat. It is not conducted via CYA e-mails. You need to stop… ";* *"l assures you further threats will not receive such a warm response…";* *"1 have built and manage a global firm with 60 or 65 or 70 of the most elite Litigators On the planet that is still growing…";* *"I am not in the mood for your ten thousand-word e-mails with multiple fonts bolded with underlines and italics. It's juvenile…";* *"Team, someone jump on this and ensure we are handling this proprietary.  I cannot be the person dealing with default judgment prove-up hearings…"* [Please see Exhibit R]

92.    After receiving no feedback from Pierce, Sorkowitz, or Pierce Bainbridge about Ecowin's MFDJ and the amount of potential damages that Pierce and others intended on providing to the court, ESCAMILLA once again emailed Pierce and Pierce Bainbridge requesting counsel provide him with an estimate as to Ecowin's potential liability.

93.    ESCAMILLA also advised Pierce, Sorkowitz, and Pierce Bainbridge, that he would not agree to consent to release JR, MR, and their law firm from his company's Florida suit. [Please see Exhibit S]

94.    Once again, instead of responding ESCAMILLA's email as to Ecowin's potential liability or his refusal to consent to release JR, MR, and their law firm from GREENWAY's Florida suit, Pierce proceeded to threaten ESCAMILLA, by stating:

• *"Didn't I tell you to stop threatening me/us and to Leave me off your emails?…*

• *"Now leave me alone until you force me to be deposed and testify at trial. Otherwise, I do not want to see you or hear your name even. This will not be a pleasant experience for you…"*

[Please see Exhibit T]

89.    On or about March 28, 2019, ESCAMILLA responded to Pierce where he expressed that he was confused and felt abandoned by his attorneys and requested an explanation for their

actions that Pierce, Sorkowitz, Nisonson, Pierce Bainbridge, and WPDB ignored with Escamilla stating in part;. [Please see Exhibit U]

*"Your responses to our inquiries are simply unacceptable"...*

*"You are Greenway Nutrients, Inc' Lead attorney and why is it somehow okay for you to be too busy to make good on your promises, communicate, or respond to your client's inquiries about the conduct of Mike Ryan, James Ryan, or The Ryan Law Group, LLC, in our case or Greenway' questions as it relates to the motion for default judgment against defendant Ecowin Co. LTD?...*

90.    On or about March 29, 2019, the PETITIONERS assert, Pierce Bainbridge and WDPB filed a false and materially misleading motion to withdraw as counsel or record on behalf of ESCAMILLA's company because Escamilla refused to consent to agree to release JR, MR, and their law firm from Greenway's Florida suit.

91.    Pierce Bainbridge and WDPB performed NO discovery, took NO depositions, and failed to serve the primary ringleader Selakovic before abruptly abandoning GREENWAY's Florida suit.

92.     The PETITIONERS assert that Pierce, Sorkowitz, Nisonson, Pierce Bainbridge, and WDPB took advantage of Escamilla and deliberately failed to prepare or present Greenway's MFDJ against Ecowin resulting in zero damages being awarded to GREENWAY.

**ESCAMILLA FILED AN UNCONTESTED MOTION TO STRIKE DEFENDANTS PLEADINGS FOR FRAUD ON THE COURT**

93.    On or about April 18, 2019, in an effort to notify the court of the egregious attorney misconduct taking place behind the scenes, ESCAMILLA filed an Uncontested Motion To Strike Defendants Pleadings For Fraud On The Court ("MTSDP") against Pierce, Sorkowitz, Nisonson, WDPB, Pierce Bainbridge, JR, MR, and their law firm. ***See Greenway Nutrients, Inc. vs. Selakovic et al., #9:18-cv-81104 Docket Entry 102***

94.    Included in ESCAMILLA's MTSDP, he provided the court with evidence demonstrating that Pierce, Sorkowitz, Nisonson, WDPB, Pierce Bainbridge, JR, MR, and their law firm engaged in a pattern of unethical behavior and flagrant attorney misconduct including, but not

limited to, allegations of the following violations of rules of professional conduct described in more detail below:

• Failure to investigate, and well as intentional omissions of material evidence.

• Knowingly providing the court with false and misleading pleadings or filings.

• Withholding as well as concealing material evidence and abandoning ESCAMILLA's company's Florida lawsuit, as a result of his refusing to agree to release JR, MR, and their law Firm, from his company's Florida lawsuit.

• Failure by counsel to follow through on the promise to provide ESCAMILLA with an expert witness to prepare a report as to his company's uncontested MFDJ against Ecowin in what ESCAMILLA asserts, upon information and belief, was a concerted effort to deliberately undermine and minimize his company's multi-million damage award against Ecowin.

• Fraud upon the court, pursuant to federal rules of civil procedure 26(g)(1), (3) and 1.540 (a), (b)(1),(2),(3),(4),(5)

• Client abandonment.

96.    That same day, on or about April 18, 2019, the Court denied the MTSDP on the basis that the PETITIONERS are unable to represent themselves In Pro Per.

97.    On or about May 1, 2019 the Florida lawsuit was dismissed without prejudice for non-prosecution, as ESCAMILLA had no financial resources to engage another law firm to prosecute the case.

### JR UNLAWFULLY SERVING AS INTERIM CEO OF VEGL

98.    On or about January 25, 2020, ESCAMILLA discovered that JR was now acting as the interim CEO of VEGL. This is the same JR that Pierce, Sorkowitz, Nisonson, Pierce Bainbridge, and WDPB demanded that Escamilla release from his company's Florida civil suit. [Please see Exhibit V]

## ESCAMILLA ONCE AGAIN CONTACTED DHS AGENT GIBSON TO UPDATE HIM ON THE RECENT EVENTS

99. ESCAMILLA advised DHS Agent Gibson and DOJ officials operating out of the Western District of Missouri about the negative outcome of his company's Florida suit and provided them with a copy of his uncontested MTSDP.

100. Escamilla also provided material evidence to DHS Gibson and DOJ officials of GREENWAY'S allegations of its former attorneys JR, MR, and their law firm of engaging in stock and securities fraud violations. There has been no response.

101. ESCAMILLA requested that Gibson or DOJ officials advise him of his federal crime victims' rights according the CRVA, or to please put him in contact with any other DHS or DOJ official who can, as mandated by the CRVA. [Please see Exhibit W]

102. Gibson, and DOJ officials have failed to respond to and ignored ESCAMILLA's repeated and desperate pleas for help or *protection* from SELAKOVIC, BLACKBURN, entities operated and controlled by SELAKOVIC, and now Greenway's former attorneys.

103. Gibson, and DOJ officials have offered ESCAMILLA NO victims assistance, provided him with NO information regarding the disposition of charges, and NO information regarding any potential deferred prosecution agreements or plea bargains that the Government may have reached with the DEFENDANTS without ESCAMILLA's knowledge or input.

104. ESCAMILLA also advised DHS Gibson, and DOJ officials that he believes that Selakovic, with the assistance of MR, and JR, and their law firm paid-off or bribed Pierce, Sorkowitz, Nisonson, Pierce Bainbridge, and WDPB to abandon Greenway's Florida suit. ESCAMILLA received no response.

## THE PIERCE BAINBRIDGE LAW FIRM IMPLOSION

105. Since abandoning GREENWAY's Florida suit the Pierce Bainbridge law firm has taken a well-publicized nose-dive and imploded with over sixty (60) attorneys and named partners

VICTIMS' EMERGENCY PETITION FOR
ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT,
18 U.S.C. SECTION 3771

resigning from the firm stemming from allegations of substantial financial impropriety and questionable conduct on behalf of Pierce personally.

106.    According to a law360.com news article entitled, "Pierce Bainbridge Founder Paid For Client's Lease, Suit Says," published on July 22, 2020, states in part:

• *"A new suit claims Pierce Bainbridge founder John Pierce put up a client in a $1.3 million California home for nearly two years while the man was the plaintiff in a controversial suit against Microsoft, an unusual arrangement that experts said could run afoul of prohibitions on lawyers paying clients."...*

• *...May 2019 suit claimed Pierce valued the Gears of War case at $1 billion in order to attract funding for Pierce Bainbridge. The complaint also says Pierce "had the audacity to ask [Pierce Bainbridge] personnel to negotiate" a $250,000 direct payment to Hamilton, "when Pierce reportedly already had paid for living quarters" and travel expenses for him, as well as giving Hamilton a "likely no-show" job as Pierce's driver.*

[Please see Exhibit X]

107.    The well-publicized and disturbing allegations waged by numerous other parties against Pierce and Pierce Bainbridge, appear to support ESCAMILLA's ongoing concerns of the well-heeled Defendant SELAKOVIC with ties to the President of Serbia, and a wealthy - U.S. Sanctioned Serbian weapons dealer, who maintains a proven track record of paying bribes in exchange for political favors and potentially *the-driving-force* behind the egregious foul-play evidenced in ESCAMILLA's uncontested MTSDP filed with the court during the his company's Florida suit.

//

//

//

VICTIMS' EMERGENCY PETITION FOR
ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT,
18 U.S.C. SECTION 3771

**WITHIN DAYS OF ABANDONING GREENWAY'S FLORIDA LAWSUIT, PIERCE BAINBRIDGE PAID PRAVATI CAPITAL LLC.("PRAVATI"),$9.1 MILLION DOLLARS TO CURE PRAVATI'S LITIGATION FUNDING DEFAULT THAT PRAVATI FILED AGAINST PIERCE BAINBRIDGE.**

108.    To Compound ESCAMILLA's concerns, he has since discovered that within days of abandoning GREENWAY's Florida suit, Pierce Bainbridge was somehow able to generate funds to cure a $9.1M litigation default that Pravati filed against Pierce Bainbridge.

109.    Since then, Escamilla has repeatedly contacted Pierce, Sorkowitz, Nisonson, Pierce Bainbridge, WDPB, and Pravati, requesting copies of his company's litigation funding paperwork to no avail.

110.    Pierce, Sorkowitz, or Pierce Bainbridge were contractually obligated to report to Pravati during Pierce Bainbridge' and WDPB's representation of Greenway. The aforementioned parties have continued to conceal key information and documents from Escamilla.

**ESCAMILLA PROVIDED EVIDENCE TO DHS AGENT GIBSON, AND DOJ OFFICIALS, DEMONSTRATING DEFENDANTS' AND JR'S HISTORY AND PATTERN OF OPERATING A MASSIVE AND ILLICIT TRANSNATIONAL COUNTERFEIT GOODS AND SALES SCHEME FOR OVER A DECADE**

111.    According to numerous permanent federal injunctions, DEFENDANTS and JR have been pulling this same illicit counterfeit goods and sales scheme for well over a decade. As evidenced in www.courthousenews.com news article entitled, "Alleged Adobe Bootlegger Held in Contempt in Fla." that states, in part;…

"*A Florida man alleged to have sold counterfeit Adobe software for at least 20 years has been held in contempt of court for violating an asset-freeze order."…*

*"In a lawsuit filed in Miami Federal Court on August 21, 2014, Adobe Systems Inc. claims that defendant Steven BLACKBURN and business entities he controls willfully sold counterfeit and/or bootlegged Adobe-branded software **since at least 1993.**"…*

[https://www.courthousenews.com/alleged-adobe-bootlegger-held-in-contempt-in-fla/]

1.　　SELAKOVIC and BLACKBURN have a well-documented history of getting caught utilizing various corporate entities to facilitate the unlawful manufacturing, distribution and sales of copious amounts of counterfeit, fake, grey market, or unauthorized versions of other companies' products, unlawfully bearing the victimized companies' trademarks.  GREENWAY is among these victims.

2.　　According to multiple court filings spanning well over a decade, DEFENDANTS have a history of paying JR to defend them against the aforementioned lawsuits.  This appears to be facilitated through unlawfully derived proceeds that DEFEDANTS can generate while the lawsuits against them would be ongoing.

**THE FBI HAS KNOWN ABOUT SELAKOVIC AND BLACKBURN' ILLICIT TRANSNATIONAL COUNTERFEIT GOODS SCHEME SINCE FEBRUARY OF 2000.**

112.　　Worse yet, it appears that federal law enforcement officials with the United States Federal Bureau of Investigation ("FBI"), have also been aware of SELAKOVIC's, BLACKBURN's, and JR's illicit transnational counterfeit goods scheme since at least 2000.

113.　　According to an online news article, local police and FBI officials successfully raided a warehouse in Pflugerville, Texas, seizing counterfeit versions of Microsoft software products that SELAKOVIC's corporate entity named Bantech is reported to have supplied to BLACKBURN, as well as to a corporate entity named MBC Enterprises, LC.  A news article entitled "Microsoft software suit names S.L. firm" states in part:

*"The lawsuit, filed this week in U.S. District Court, names MBC Enterprises LC, its owner, James D. Craghead, and Steve BLACKBURN."…*

*"BLACKBURN, who was employed as a Microsoft anti-piracy hotline operator in Utah between May and September 1999, is also being sued for breaking a non-disclosure agreement and misappropriation of Microsoft trade secrets which he allegedly revealed while employed at MBC."*

VICTIMS' EMERGENCY PETITION FOR ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT, 18 U.S.C. SECTION 3771

30

*"According to the lawsuit, police and FBI agents served a search warrant on Feb. 28 at a business known as Bantech in Pflugerville, Texas. During the search, "large quantities of counterfeit Microsoft Windows 98 and Office 2000 software CDs were found at the Bantech facility, along with business records indicating a large-scale counterfeit distribution operation."*

[https://www.deseret.com/2000/3/17/19496608/microsoft-software-suit-names-s-l-firm]

## A PARTIAL LIST OF THE SELAKOVIC'S, BLACKBURN'S AND JR'S PAST LITIGATION HISTORY

114.    ESCAMILLA provided evidence and information to Gibson and others that GREENWAY's former attorney JR has defended BLACKBURN and SELAKOVIC in multiple civil-theft related manufacturing and distribution lawsuits filed by Microsoft and Adobe.  Both companies successfully obtained numerous permanent federal injunctions against BLACKBURN and SELAKOVIC in those cases.

115.    **Microsoft Corporation v. MBC Enterprises, Steven Blackburn Case No. 2:00-CV-00217**.  This case alleged that SELAKOVIC's corporate entity called Bantech, supplied counterfeit, fake, or unauthorized versions of Microsoft software products to BLACKBURN and MBC Enterprises.  Microsoft successfully obtained a permanent federal injunction against all accused defendants in this case.  JR represented BLACKBURN in this suit.

116.    **Microsoft Corp. v. Big Boy Distribution LLC Case No. 07-80296-CIV**.  In this case SELAKOVIC's corporate front named Selacorp supplied BLACKBURN's entity named Big Boy Distribution with copious amounts of counterfeit, fake, or unauthorized versions of Microsoft Software products. Microsoft successfully obtained a permanent federal injunction against all defendants in this case. JR represented BLACKBURN in this suit.

117.    **Adobe Systems Incorporated v. Bea's Hive LLC, Selacorp, David Selakovic, Steve Blackburn Case #9:14-cv-81102.** JR is still currently defending SELAKOVIC, and now VEGL, in this lawsuit wherein SELAKOVIC's entity named Selacorp was finally caught illegally

supplying over 370,000 individual units of counterfeit, fake, or unauthorized versions of Adobe' software, to BLACKBURN, and entities owned or controlled by SELAKOVIC.  Adobe successfully obtained an immediate permanent federal injunction against all Defendants in this case that is still ongoing.

118.    To demonstrate the SELAKOVIC's, and entities owned and controlled by the him potential culpability as the alleged ringleaders responsible for OSS, according to deposition transcripts obtained in Adobe' ongoing litigation against SELAKOVIC (personally), BLACKBURN admitted to unlawfully purchasing over **370,000** individual units of illegitimate downloadable product key-codes, counterfeit, fake, or unauthorized versions of Adobe' software illegally bearing Adobe's trademark, and eventually wiring, over **forty eight million dollars ("$48,000,000.00")** in illegally obtained revenues derived through the unlawful sales of illicit versions of Adobe's software, to entities operated and controlled by the SELAKOVIC. [Please see Exhibit Y]

119.    **Greenway Nutrients, Inc. vs. David Selakovic et al. civil case #9:18-cv-81104:** JR represented himself, MR, VEGL, SELAKOVIC, BLACKBURN, as well as all other accused defendants, intentionally concealed evidence, filed multiple sham pleadings, while committing deliberate Fraud Upon The Court.  *See Greenway Nutrients, Inc. vs. Selakovic et al., #9:18-cv-81104 Docket Entry 102*

**ESCAMILLA AND GREENWAY CONTINUE TO SUFFER IRREPARABLE HARM**

120.    ESCAMILLA and GREENWAY continue to needlessly suffer irreparable harm and damages as result of DHS Agent Gibson, DHS Resident Agent Simons, OPR, CRCL, as well as DOJ officials ignoring ESCAMILLA, failing to advise him of his crime victims' rights, or protect him from further harm caused by SELAKOVIC, BLACKBURN, and entities owned or controlled by SELAKOVIC, in audacious contravention of CRVA.  This has been going on for years.

121.    In fact, the Government has violated every element of the CVRA and is continuing to needlessly prejudice and deny ESCAMILLA and GREENWAY any of their crime victims' rights.

122.    Government is aware that DEFENDANTS may be in violation of numerous additional federal statutes, including but not limited to: embezzlement, 18 U.S.C.  §645, securities and commodities fraud, 18 U.S.C. §1348, mail and wire fraud, 18 U.S.C. §1343.

123.    DHS officials advised ESCAMILLA of the Government's unwillingness to investigate his criminal allegations against the DEFENDANTS.  ESCAMILLA's previously filed criminal trademark infringement complaint now pales-in-comparison to the potential and much more severe criminal statutes mentioned above.

124.    Furthermore, PETITIONERS assert that the DEFENDANTS together with JR and MR may have potentially reached a confidential deferred prosecution agreement with Federal prosecutors that PETITIONERS had no involvement in or were ever properly advised of.  This is in direct violation of the CRVA.

125.    ESCAMILLA further asserts, that it is not outside the realm of possibility, that the well-heeled Defendant SELAKOVIC may have utilized his High-Powered political connections with Serbian President Alexander Vucic, and a well-known U.S. Sanctioned - Serbian Arms Dealer, named Slobodan Tesic, who according to the U.S. Department of The Treasury, has a well-established history of engaging in **bribery and corruption** facilitated through various corporate entities and business associates operated and/or ultimately controlled by Mr. Tesic.

126.    ESCAMILLA also advised DHS Agent Gibson and DOJ officials that he was concerned for his personal safety due to SELAKOVIC's ties to organized crime that is responsible for supplying terrorist organizations with substantial amounts military weaponry for decades, who may wish to cause him physical harm.

127.     As of the filing of this Petition, DHS and DOJ officials have been negligent in affording the Petitioner any of the rights as envisioned in the CVRA and respectfully asks this Court to order enforcement of the CVRA to advise the Petitioner of his rights as well as protect him from further harm and mandated by CRVA.

## MEMORANDUM

### A.  THE CRIME VICTIMS' RIGHTS ACT MAKES CRIME VICTIMS INDEPENDENT PARTICIPANTS THROUGHOUT THE CRIMINAL JUSTICE PROCESS

Pursuant to 18 U.S.C. § 3771, Crime victims' have the following rights:

(a) RIGHTS OF CRIME VICTIMS. A crime victim has the following rights:

(1) The right to be reasonably protected from the accused.

(2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.

(3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

(4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

(5) The reasonable right to confer with the attorney for the Government in the case.

(6) The right to full and timely restitution as provided in law.

(7) The right to proceedings free from unreasonable delay.

(8) The right to be treated with fairness and with respect for the victim's dignity and privacy.

(9) The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.

(10) The right to be informed of the rights under this section and the services described in section 503(c) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)) and provided contact information for the Office of the Victims' Rights Ombudsman of the Department of Justice.

*The Crime Victim's Rights Act*, 18 USC § 3771 ("CVRA") gives Crime Victims' Rights to participate in Federal criminal proceedings. Congress was concerned that in the Federal system crime

victims were "treated as non-participants in a critical event in their lives. They were kept in the dark by prosecutors too busy to care enough…and by a court system that simply did not have a place for them." *150 Cong. Rec*. S4262 (April 22, 2004)(*Sen. Feinstein*). To remedy this problem, Congress gave victims "the simple right to know what is going on, to participate in the process where the information that victims and their families can provide may be material and relevant…" *Id.*

In the case at bar, PETITIONERS are the victims of multiple crimes committed by the bad actors that is compounded by DHS Agent Gibson's and Simon's contradictory statements attempting to *coerce* and *mislead* ESCAMILLA confusing and misleading him. His company has gone from identified the "Lead Victim" to being told that he would have to prosecute, pay-for, and prevail in a Colorado federal civil trademark infringement case against the SELAKOVIC, on behalf of his company, before the Government would continue to investigate his case. ***Nowhere in the CRVA is there even a suggestion that victims have to maintain their own action as a contingency of receiving the rights afforded under the CRVA.***

While not a part of this Petition, it should be duly noted that the public entity's employee is immune from any intentional or negligent misrepresentation unless he or she is guilty of "actual fraud, corruption or actual malice." (Government Code Section 822.2).

The employee "immunity afforded by Government Code section 822.2 applies unless, in addition to the essentials of common law deceit, a public employee is motivated by corruption or actual malice, i.e., a conscious intent to deceive, vex, annoy or harm the injured party in his business" (Schonfeld v. City of Vallejo (1975) 50 Cal. App.3d 401, 409-410).

Moreover, the CRVA gives victims of Federal crimes a series of rights, including the right to notice of court proceedings, to be heard at plea and sentencing hearings, and to reasonably "confer with the attorney for the Government in the case." 18 U.S.C. § 3771(a).

Victims also have a "right of access to the terms of a plea agreement…" *In re interested Party 1*, 530 F.Supp. 2d 136, 2008 WL 134233 at 7 (DDC 2008). The CVRA also assures victims broadly that they will be "treated with fairness." 18 U.S.C. § 3771(a)(8).

To ensure that victims are notified of their rights, the CVRA directs employees of the Justice Department "and other departments and agencies of the United States engaged in the detection, investigation, or prosecution of crime" to use their "best efforts to see that crime victims are notified of…the rights described [in the CVRA]." 18 U.S.C. § 3771(c)(1).

Clearly, if DHS Agent Gibson, Simons, and other DHS, and DOJ officials, have used "best efforts" to assist PETITIONERS pursuant to the law, this Petition would be unnecessary.

### B.  THE CVRA GIVES VICTIMS RIGHTS DURING THE INVESTIGATION OF A CRIME

The CVRA gives victims the right to confer with the attorney assigned to represent the government prosecution. The Fifth Circuit recently spoke to Victim's Rights:

> The district court acknowledge that "[t]here are clearly rights Under the CVRA that apply before any prosecution is underway." BP Prods., 2008 WL 501321 at 11; 2008 U.S. LEXIS 12893 at 36. Logically, this includes the CVRA's establishment of victims'"reasonable right to confer with the attorney for the Government."
> 18 U.S.C. § 3771(a)(5). At least in the posture of this case (and we Do not speculate on the applicability to other situations), the Government should have fashioned a reasonable way to inform the victims of the likelihood of criminal charges and to ascertain the victims 'views on the possible details of a plea bargain.*In re Dean*, 527 F.3d 391, 394 (5th Cir. 2008)

The position that CVRA rights apply before charges have been filed is consistent with DOJ's regulations under the CVRA, which explains that government officials "must advise a victim [about their rights under the CVRA]…at the earliest opportunity at which it may be done without interfering with an investigation." *A.G. Guidelines for Victim and Witness Assistance (May 2005)*. The plain language of the CVRA undergirds this conclusion, as it applies not simply to prosecutors but to government agencies "engaged in the detection [and] investigation…of crime…" 18 U.S.C. §

VICTIMS' EMERGENCY PETITION FOR
ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT,
18 U.S.C. SECTION 3771

36

3771(c)(1). Indeed, if there were any doubt, the plain language of the CVRA extends victims' right to situations "in which no prosecution is underway." 18 U.S.C. § 3771(d)(3).

If no underlying prosecution is required, *why did Mr. Gibson require ESCAMILLA to maintain his own civil action and prevail therein to trigger the protections of the CRVA?*

Moreover, the 11th Circuit recently found that the CVRA affords crime victims the opportunity to meet or confer with federal prosecutors only *after* criminal charges had been filed against the accused suspects by stating in relevant part; *see In re: COURTNEY WILD, Petitioner - On Petition for Writ of Mandamus to the United States District Court for the Southern District of Florida, D.C. Docket No. 9:08-cv-80736-KAM, April 14, 2020.*

"we conclude that the CVRA is best understood—in accordance with its terms and the context in which it was enacted—to apply **only after the initiation of criminal proceedings.** To the extent the Act's language and structure leave any doubt about its proper scope, we must assume that Congress "acted against the backdrop of long-settled understandings about the independence of the Executive with regard to charging decisions." *Fokker Servs., 818 F.3d at 738*. Had Congress intended to upend (rather than reinforce) those "long-settled understandings," we can only assume it would have expressed itself more clearly. S*ee, e.g., Puerto Rico v. Franklin California TaxFree Trust, 136 S. Ct. 1938, 1947 (2016)* ("Congress 'does not, one might say, hide elephants in mouseholes.'" (*quoting Whitman v. American Trucking Assns., Inc., 531 U.S. 457, 468 (2001))).*"

In the aforementioned proceedings the 11th Circuit Court denied petitioner's request for relief on the ground that she had failed to show "continuing, present adverse effects" or any "real and immediate" threat of future CVRA violations."

In the case at hand, the PETITIONERS' emergency CVRA petition clearly demonstrates that there is "continuing, present adverse effects" and a very "real and immediate" threat of future CVRA violations.

Moreover, during Escamilla's and his business partners face to face meeting with DHS officials, DHS Agent GIBSON advised Escamilla that **criminal charges and sealed federal criminal indictments** have been filed against SELAKOVIC and BLACKBURN who DHS officials represented were the alleged ringleaders responsible for OSS.

PETITIONERS is a victim of a federal crime, who has continued to be needlessly victimized by the well-heeled and politically connected Defendant SELAKOVIC, BLACKBURN, and entities operated and controlled by the SELAKOVIC, and to the continued unlawful actions of his former lawyers MR and JR, who conspired with and embezzled confidential insider information obtained while representing his company during the confidential reverse-merger discussions with VEGL.  This was is direct violation of the following federal criminal statutes, including, but not limited to, embezzlement, 18 U.S.C.  § 645, securities and commodities fraud, 18 U.S.C. § 1348, mail and wire fraud, 18 U.S.C. § 1343.

### C.  PETITIONERS IS A "VICTIM" PROTECTED BY THE CVRA

Under the CVRA the crime victim is defined as "a person directly and proximately harmed as a result of the commission of a Federal offense…" 18 U.S.C. § 3771(e).  Not only must the CVRA as a whole be interpreted liberally, but its definition of "crime victim" requires a generous construction. "[T]his is an intentionally broad definition because all victims of crime deserve to have their rights protected…" *150 Cong. Rec*. S10912 (October 9, 2004).

PETITIONERS were "directly and proximately" harmed by these crimes, thereby making them victims under the CVRA. It should be emphasized that the CVRVA "was designed to be a 'broad and encompassing' statutory victims' bill of rights." United States v. Degenhardt, 405 F.Supp.2d 1341, 1342 (D. Utah 2005) (quoting 150 Cong. Rec. S4261 (daily ed. Apr. 22, 2004) (statement of Sen. Feinstein)).

Congress intended the CVRA to dramatically rework the federal criminal justice system. In the course of construing the CVRA generously, the Ninth Circuit observed: "The criminal justice system has long functioned on the assumption that crime victims should behave like good Valedictorian children -- seen but not heard. The Crime Victims' Rights Act sought to change this by making victims independent participants in the criminal justice process." Kenna v. US. Dist. Court/or CD. Cal., 435 F.3d 1011, 1013 (9th Cir. 2006). Accordingly, because the CVRA is remedial legislation, courts should interpret it "liberally to facilitate and accomplish its purposes and intent." Elliott Industries Ltd. Partnership v. BP

America Production Co., 407 F.3d 1091, 1118 (10th Cir. 2005) (noting remedial legislation should be "interpreted liberally to facilitate and accomplish its purposes and intent"). The CVRA itself suggests this conclusion by requiring that courts must treat crime victims with "fairness." United States v. Patkar, 2008 WL 233062 at *3 (D. Haw. 2008) (citing United States v. Turner, 367 F.Supp.2d 319,335 (E.D.N.Y. 2005)). Not only must the CVRA as a whole be interpreted liberally, but its definition of "crime victim" requires a generous construction. After reciting the direct-and-proximate-harm language at issue here, one of the Act's two co-sponsors -- Senator Kyl -- explained that "(t]his is an intentionally broad definition because all victims of crime deserve to have their rights protected...." 150 Cong. Rec. S10912 (Oct. 9, 2004) (emphasis added).

The description of the victim definition as "intentionally broad" was in the course of floor colloquy with the other primary sponsor of the CVRA and therefore deserves significant weight. See Kenna, 435 F.3d at 1015-16 (discussing significance of CVRA sponsors= floor statements). The definition of "crime victims" must thus be construed broadly in favor of PETITIONERS.

ESCAMILLA and GREENWAY, his company, obviously qualify as "victims" under the CVRA. PETITIONERS have been ignored and kept in the dark even though they continue to be victimized SELAKOVIC, BLACKBURN, and entities operated and ultimately controlled by the SELAKOVIC, who created a similar PPM, that SELAKOVIC embezzled to execute an unlawful reverse-merger while taking VEGL public for their self-dealing gain, destroying ESCAMILLA's opportunity to take GREENWAY public.

Yet the government has sat idly by and failed to inform PETITIONERS of any plea bargains or conferred with PETITIONERS or informed them of their rights under the CVRA.

**D. PETITIONERS ARE ENTITLED TO NOTICE OF THEIR RIGHTS, AN OPPORTUNITY TO CONFER WITH THE PROSECUTORS AND TO BE TREATED WITH FAIRNESS**

Because PETITIONERS are "victims" under the CVRA, they have certain protected rights under the Act. Most important, the Act promises that PETITIONERS will have an opportunity to "confer with

VICTIMS' EMERGENCY PETITION FOR
ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT,
18 U.S.C. SECTION 3771

the attorney for the Government in the case." To date, PETITIONERS have not been given that right. This raises the very real possibility that the Government may negotiate and conclude a plea agreement with SELAKOVIC, BLACKBURN, or entities operated or ultimately controlled by the SELAKOVIC, in essence violating ESCAMILLA's and GREENWAY's rights.

PETITIONERS are entitled to have this conference with prosecutors before any final plea agreement is reached. The Fifth Circuit reached this conclusion in *In re Dean*, 527 F,3d 391 (5th Cir. 2008), the Government negotiated a plea agreement with the well-heeled corporate defendant without conferring with the victims. When the Government's failure was challenged in the Fifth Circuit, the Fifth Circuit observed: "In passing the [CVRA], Congress made the policy decision-which we are bound to enforce-that victims have a right to inform the plea negotiation by conferring with prosecutors before a plea is reached." *Id.* At 394.

Over the course of the last 5 years, PETITIONERS have been needlessly denied the right to confer, have been given no notice of any court proceedings or plea bargains, and were given misleading and conflicting legal advice by DHS Agent Gibson and DHS OPR Resident Agent Simons.  In addition, both agents required the PETITIONERS to earn victim status by filing and prevailing in another costly civil lawsuit against SELAKOVIC. This shifted the burden of prosecution to ESCAMILLA and GREENWAY which is completely against the letter and the spirit of the CVRA.

This Court is obligated to protect PETITIONERS' rights. The CVRA directs that "[i]n any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights described in [the CVRA]." 18 U.S.C. § 3771(b)(1). The CVRA also confers on crime victims the right to "assert the rights in [the CVRA]." 18 U.S.C. § 3771(d)(1). Therefore, this Court has its own independent obligation to intercede and ensure that the Government respects the rights of PETITIONERS under the CVRA.

As of the date of this Petition, PETITIONERS have not been afforded their rights under the CVRA and respectfully ask this Court for relief, as they have no other remedy.

VICTIMS' EMERGENCY PETITION FOR
ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT,
18 U.S.C. SECTION 3771

40

## E.  CONCLUSION

Pursuant to the CVRA, ESCAMILLA and GREENWAY had to be provided with "reasonable, accurate and timely notice of any public proceedings," "informed in a timely manner of any plea bargaining," "timely restitution as provided in law," and "the right to be informed of the rights…and services.  Instead, DHS Agent Gibson's insisted that before DHS or DOJ officials would make any further investigation into PETITIONERS' criminal trademark infringement allegations, GREENWAY first had to prevail in its Colorado civil case, instructions that DHS Resident Agent SIMONS later contradicted, confusing Escamilla even further.

As of the filing of this Petition, DHS and DOJ officials have been negligent in affording ESCAMILLA and GREENWAY any of the rights as envisioned in the CVRA.  PETITIONERS respectfully ask this Court to order the enforcement of the CVRA and to advise ESCAMILLA of his rights as well as protect him from further harm and mandated by CRVA.

Dated this 25th day of February 2021.


Respectfully submitted,


/s/ *Dmitry Y. Gurovich*
DMITRY Y. GUROVICH, Esq.
Counsel for Petitioners

VICTIMS' EMERGENCY PETITION FOR
ENFORECMENT OF CRIME VICTIM'S RIGHTS ACT,
18 U.S.C. SECTION 3771

41